**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LISA DEFRANK, HOLLIS STAVN, CHRIS GARCIA, MARK DITROIA, CARL GERSH, WENDY DOWDS, MARIA KEENE, ASHLEY NUIBE, <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS AMERICA, INC. <br><br> Defendants. | Civ. No. 19-21401 (KM) (JBC) <br><br> **OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

This is a class action complaint brought against defendant Samsung Electronics America, Inc. ("SEA"). Plaintiffs are consumers who purchased SEA dryers, and who now claim that the dryers are defective. Specifically, plaintiffs allege the dryers have a defective drum which develops cracks over the lifetime of the appliance. The cracks in the drum allegedly snag on clothes and also permit lint to fall into the dryers' heating element, thereby creating a risk of fire. Plaintiffs bring claims under various state consumer protection laws and the Magnuson-Moss Warranty Act ("WWMA"), as well as claims of unjust enrichment. They claim the defective drum, which SEA failed to disclose, has rendered each of their dryers inoperable well before the end of its expected useful life.

Now before the Court is SEA's motion to dismiss the complaint for failure to state a claim. (DE 51) For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

i

**TABLE OF RULINGS ON MOTION TO DISMISS**

| <u>Claim</u> | <u>Motion to Dismiss Disposition</u> | <u>Opinion Sections</u> |
| --- | --- | --- |
| Count I/UCL | Motion Denied | III.A.2.b.iii, III.A.2.c, III.A.3 |
| Count II/CFAL | Motion Denied | III.A.2.b.iii, III.A.2.c |
| Count III/CLRA | Motion Denied | III.A.2.b.iii, III.A.2.c, III.A.4 |
| Count IV/NJCFA | Motion Denied | III.A.2.b.ii, III.A.2.c |
| Count V/NMUPA | Motion Denied | III.A.2.a, III.A.2.c |
| Count VI/OCSPA | Motion Granted | III.A.5.a |
| Count VII/ODTPA | Motion Granted | III.A.5.b |
| Count VIII/MMWA | Motion Denied | III.B |
| Count IX/ Unjust Enrichment | Motion Granted against Florida, Illinois, and Ohio claims; Otherwise Denied | III.C |
| Count X/ICFA | Motion Denied | III.A.2.b, III.A.2.c |
| Count XI/FDUTPA | Motion Denied | III.A.2.b.i, III.A.2.c |

## TABLE OF ABBREVIATIONS

**Record Citations**. Citations to the record are abbreviated as follows:

"DE __" refers to the docket entry numbers in this case.

"1AC" refers to the First Amended Complaint, located at DE 22.

"Opp." refers to the plaintiff's Brief in Opposition, located at DE 54.

"MTD" refers to SEA's Memorandum in Support of its Motion to Dismiss, located at DE 51-1.

"Reply" refers to SEA's Reply in Support of its Motion to Dismiss, located at DE 59.

**State Statutes**. Applicable state consumer protection statutes, identified by initial section, are abbreviated as follows:

**Ohio**

OCSPA – Ohio Consumer Sales Practices Act, Ohio Rev. Code. Ann. § 1345.01

ODTPA – Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4565.01

OPLA – Ohio Product Liability Act, Ohio Rev. Code. Ann. § 2307.71

**New Mexico**

NMUPA – New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1

**New Jersey**

NJCFA – New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1

**Florida**

FDUTPA – Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201

**California**

CLRA – California Consumer Legal Remedies Act, Cal. Civ. Code § 1750

UCL – California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

CFAL – California False Advertising Law, Cal. Bus. & Prof. Code § 1700

**Illinois**

ICFA – Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1

**TABLE OF CONTENTS**

I.    FACTS

  A.    Background                                                                1

  B.    Allegations Regarding the Parties                                         1

  C.    Allegations that SEA Concealed a Defect in the Class Dryers               3

  D.    Allegations that SEA's Warranty is Unconscionable                         4

  E.    Procedural History                                                        5

II.   GENERAL LEGAL STANDARDS

  A.    Standard on Motion to Dismiss                                             5

  B.    Ascertainment of State Law in Diversity Case                              6

III.  DISCUSSION

  A.    Consumer Fraud Allegations and Rule 9(b)                                  7

    1.    Standards under Rule 9(b)                                           7

    2.    Claims of fraudulent omissions under state consumer
        protection statutes                                                 9

      a.    Omissions Under the NMUPA                                      10

      b.    Duties to disclose under state law                            10

        i.     Under FDUTPA, dismissal is denied because Plaintiffs
           are not required to plead a duty to disclose               11

        ii.    Under NJCFA, dismissal is denied because the complaint
           adequately alleges a duty to disclose defects which
           manifest themselves post-warranty                          14

        iii.   Under California law, dismissal is denied because the
           complaint adequately alleges a duty to disclose a defect
           that affects the central function of the dryers and poses
           an unreasonable safety risk.                               16

      c.    The complaint adequately alleges that SEA knew of the
         defect at the time of sale                                    18

    3.    Other fraudulent omissions issues: California UCL Claim
                                                                            23

    4.    Other fraudulent omissions issues: California CLRA Notice
        Requirements                                                        25

5.   Other fraudulent omissions issues: Ohio OCSPA and
     ODTPA Claims                                                        26

     a.   OCSPA claim inadequately pled and subsumed by OPLA    26

     b.   ODTPA claim dismissed for lack of consumer standing   28

B.   Federal Magnuson-Moss Warranty Act/Breach of
     Warranty                                                           29

  1.   Substantive and procedural unconscionability under MMWA   30

  2.   Reasonable opportunity to cure under MMWA                 34

C. Unjust Enrichment

  1.   Pleading unjust enrichment in the alternative             35

  2.   Unjust enrichment and third-party purchase               36

  a.   California permits unjust enrichment claims against
       a manufacturer where the product was purchased from
       a third party                                                    37

  b.   Florida unjust enrichment claim dismissed for failure
       to allege direct benefit                                        38

  c.   Illinois unjust enrichment claim dismissed for failure to
       allege required circumstances                                   39

  d.   New Jersey permits unjust enrichment claims against a
       manufacturer where the product was purchased from a
       third party                                                      40

  e.   New Mexico permits unjust enrichment claims against a
       manufacturer where the product was purchased from a
       third party                                                      44

  f.   Ohio unjust enrichment claim dismissed for failure to allege
       an economic transaction between the manufacturer and
       the plaintiff                                                    44

IV.   Conclusion                                                        46

I.    **FACTS**[1]

   **A. Background**

   SEA is a nationwide company which manufactures, designs, markets, and sells a number of products. Relevant here are certain clothes dryers SEA began selling in 2011 (the "Class Dryers"),[2] which all allegedly contain a defect which causes them to develop cracks in the dryer drum. (1AC ¶¶ 1, 115.) The alleged root causes of the defect are a defective flywheel and inappropriately thin-gauge steel in the drums. (*Id.* at 103–04.) Plaintiffs allege that the cracks can cause the dryers to become inoperable because they snag on consumers' clothing and tear them. (*Id.* ¶ 3.) Plaintiffs also allege that lint can fall through the cracks and catch fire from the dryer's heating element. (*Id.* ¶¶ 106, 175.) According to plaintiffs, the only solution is to completely replace the drum. (*Id.* ¶ 4.) All Class Dryers allegedly contain the same component parts or are a result of the same manufacturing process which causes the defect, and the defect allegedly has resulted in widespread complaints from SEA customers. (*Id.* ¶¶ 5, 7.)

   **B. Allegations Regarding the Parties**

   Plaintiffs are residents of Ohio, New Mexico, New Jersey, Florida, California, and Illinois who purchased Class Dryers.

   Plaintiff DeFrank is an Ohio resident who purchased a Class Dryer in November 2013. (*Id.* ¶¶ 22–23.) She noticed the dryer had a cracked drum in March 2018. (*Id.* ¶ 27.) She contacted SEA to make a warranty claim, and was informed that the one-year warranty did not cover her claim so SEA would not repair the dryer. (*Id.* ¶ 30.)

---

[1] The allegations of the Complaint are taken as true for purposes of this motion to dismiss. *See* Section II, *infra.*

[2] The Class Dryers include all dryers bearing model numbers listed on plaintiffs' Attachment A to its First Amended Complaint ("1AC").

Plaintiff Garcia is a New Mexico resident who purchased a Class Dryer in 2015. (*Id.* ¶¶ 32–33.) He alleges that a year after he purchased the dryer, he began noticing that his clothes were getting lost or stuck in the dryer, that metal shards were appearing in his laundry, and that the dryer emitted a loud banging noise when in use. (*Id.* ¶¶ 36, 38.) He claims he contacted SEA for warranty assistance but was informed that his warranty had expired. (*Id.* ¶ 37.)

Plaintiff Mark DiTroia is a New Jersey resident who purchased a Class Dryer at Lowe's Home Improvement in December 2011. (*Id.* ¶¶ 40–41.) In September 2017, Mr. DiTroia alleges he began hearing a loud banging when the dryer was in use, and he discovered upon investigation that the drum had cracked and was hitting its roller, causing the banging sound. (*Id.* ¶¶ 44–45.) Mr. DiTroia initially replaced the drum himself, but once the banging noise returned, contacted SEA to complain. (*Id.* ¶ 46–47.) SEA representatives told him that there were no reported issues regarding the product and that his dryer was out of warranty. (*Id.* ¶ 47.)

Plaintiff Carl Gersh is a Florida resident who purchased a Class Dryer from Best Buy on September 10, 2015. (*Id.* ¶¶ 49–50.) Sometime around April or May of 2018, Mr. Gersh allegedly noticed a loud banging from the dryer and discovered a hole in its drum. (*Id.* ¶¶ 53–54.) He alleges that he contacted SEA to make a warranty claim and was told that the warranty had expired. (*Id.* ¶ 55.)  He then attempted to repair the dryer through a third-party, but, shocked at the cost, elected instead to contact SEA again via its Internet forum and Twitter account. (*Id.* ¶¶ 56–57.) After that failed to elicit a favorable response from SEA, he finally replaced the dryer. (*Id.* ¶¶ 58–59.)

Plaintiff Wendy Dowds is a California resident who purchased a Class Dryer on May 10, 2017 from Lowe's Home Improvement and noticed it had a cracked drum in June of 2018. (*Id.* ¶¶ 60–61, 64–65.) Ms. Dowds then contacted SEA to make a warranty claim, but was denied. (*Id.* ¶ 66.)

Plaintiff Maria Keene is a resident of Illinois who purchased a Class Dryer for her son from Home Depot on March 20, 2016. (*Id.* ¶¶ 68–69.) Ms.

Keene noticed a crack in the dryer drum in February of 2018. (*Id.* ¶¶ 72–73.) Her son then contacted SEA, which told him that the warranty had already expired. (*Id.* ¶¶ 72–73.)

Plaintiff Ashley Nuibe is a resident of the State of Ohio who purchased a Class Dryer from Best Buy in January 2016. (*Id.* ¶¶ 76–77.) She noticed a banging noise when the dryer was in use in March of 2018, and, upon complaining to SEA, was informed that her warranty had already expired. (*Id.* ¶¶ 80–82.)

### C. Allegations that SEA Concealed a Defect in the Class Dryers

Plaintiffs allege SEA knew as early as 2012 that the Class Dryers had a defect which would cause cracks in the drum and render the dryers inoperable. (*Id.* ¶¶ 9, 129.) They claim SEA was obligated to disclose that information to the public so that consumers would know that the Class Dryers were low quality appliances that posed a risk of fire to consumers' households; that they would not last their expected useful life; that they would require significant repairs and out-of-pocket expenses; and that they would not be meaningfully protected by the one-year warranty. (*Id.* ¶¶ 124–29, 131.) They fault SEA for continuing to market, advertise, and sell the Class Dryers without disclosing the alleged defect. Such marketing, they allege, was false and misleading because a reasonable consumer would not have suspected that the Class Dryers were incapable of serving their ordinary purpose. (*Id.* ¶¶ 15, 129.)

Plaintiffs make a number of allegations regarding SEA's knowledge of the defect. They claim that SEA would have learned of the defect at a facility in Suwon, South Korea, where it conducts tests on its products which involve subjecting them to extreme conditions, shaking them to simulate transportation on a truck, and monitoring their noise levels. (*Id.* ¶¶ 107–09.) They claim that SEA "likely" conducted pre-and post-release testing on the components used in the Class Dryers, including the drums and flywheels. (*Id.* ¶ 111.)

Plaintiffs also allege that SEA learned of the defect through consumer complaints. Specifically, they allege that SEA received numerous customer complaints about the defect by phone, letter, and warranty claims as early as 2012. (*Id.* ¶ 116.) They further allege SEA received numerous consumer complaints on its website, its storefront at Amazon.com, and on third-party consumer complaint forums. (*Id.* ¶ 117.) They include a number of sample consumer complaints from 2017 and 2018 which describe cracked dryer drums, to which SEA employees responded with refusals to provide warranty coverage. (*Id.* ¶¶ 119.) Plaintiffs also note a number of reviews on SEA's Amazon.com storefront from 2013, 2014, and 2017, and posts on various other third-party review platforms from as early as 2012, all of which identify the cracked drum defect as a source of problems for the Class Dryers. (*Id.* ¶¶ 122–23.)

As a result, SEA allegedly knew or should have known the drums contained a defect which posed a safety risk and could render the appliance useless, and SEA knew the defect would manifest itself only after a year of regular use, outside the warranty period. (*Id.* ¶¶ 112–13.)

**D. Allegations that SEA's Warranty is Unconscionable**

SEA provided a one-year warranty for the Class Dryers. (*Id.* ¶ 97.) Under that warranty, SEA commits to provide parts and labor to repair or replace defective parts for one year. (*Id.* ¶ 98.) It also provides a two-year warranty for the dryers' "control board." (*Id.*) Plaintiffs allege that consumers are not involved in the preparation of the warranty, have no meaningful method of communicating with Samsung regarding the warranty terms or duration, and that the warranty was offered on a "take-it-or-leave-it" basis. (*Id.* ¶¶ 99, 227.) Plaintiffs also claim SEA had superior knowledge regarding the Class Dryers' design, and as a consequence knew the dryers were insufficiently durable and would fail earlier than customers would reasonably anticipate, but after the warranty expired. (*Id.* ¶ 228.)

4

In support of these claims, Plaintiffs allege that SEA knew about the defect before drafting the warranty, as discussed in Section I.B, *supra*. They also allege that the warranty is included in the dryer product packaging on a pre-printed form, and that they as consumers had no ability to discuss or negotiate the warranty with SEA. (*Id.* ¶¶ 99–100.) Plaintiffs also allege that SEA is a nationwide company with substantial market power in the United States. (*Id.*)

### E. Procedural History

Plaintiffs DeFrank, Stavn, and Garcia initially filed this complaint in the United States District Court for the Southern District of Ohio, Cincinnati Division, on April 27, 2018. (DE 1.) SEA filed a motion to dismiss on June 22, 2018, and plaintiffs amended their complaint on August 3, 2018 to add the plaintiffs from the other states. (DE 16, 22.) SEA then filed a motion to transfer venue to this Court on August 17, 2018, which was granted on December 13, 2019. (DE 32.) The defendants then filed a new motion to dismiss on February 25, 2020. (DE 51.)

On the theory that SEA knew of the defect but failed to disclose it to consumers, plaintiffs allege violations of various state consumer statutes: (1) the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"); (2) the California False Advertising Law, Cal. Bus. & Prof. Code §§ 1700 *et seq.* ("CFAL"); (3) the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA"); (4) the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 *et seq.* ("NJCFA"); (5) the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 *et seq.* ("NMUPA"); (6) the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01 *et seq.* ("OCSPA"); (7) the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. §§ 4565.01 *eq seq.* ("ODTPA"); (8) the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *eq seq.* ("ICFA"); and (9) the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA"). (1AC ¶¶ 146–214, 230–60.) They also bring an MMWA claim alleging SEA breached

an express warranty under state law by refusing to repair or replace the allegedly cracked drums, and a claim for unjust enrichment. (*Id.* ¶¶ 215–34.)

## II.   LEGAL STANDARDS

### A. Standard on Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

To survive a 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). Normally, a complaint need not contain detailed factual allegations. Fed. R. Civ. P. 8. Rather, the plaintiff need only plead sufficient facts to prove the grounds of his entitlement to relief. *Id.* Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint must contain factual allegations sufficient to raise the plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In contrast, on a motion under Rule 12(b)(6) the Court will disregard

"threadbare recitals of a cause of action, legal conclusions, [or] conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012).[3]

### B. Ascertainment of State Law in Diversity Case

This case arises in diversity, and therefore implicates state substantive law.

> This Court's "role in diversity cases is to apply state law as announced by the state's highest court." *LaBarre v. Bristol-Myers Squibb Co.*, 544 F. App'x 120, 12[4 n.7] (3d Cir. 2013) (citing *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 253 (3d Cir. 2010) ("A federal court under *Erie* is bound to follow state law as announced by the highest state court." (internal citations omitted)). "In the absence of a controlling decision by the Pennsylvania Supreme Court, we must predict how it would decide the questions of law presented in this case." *Wolfe v. Allstate Prop., & Cas. Ins. Co.*, 790 F.3d 487, 492 (3d Cir. 2015) (citing *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45-46 (3d Cir. 2009)).

*Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 376 (D.N.J. 2019). The court will primarily consider "decisions of the state's intermediate appellate courts for assistance in determining how the highest court would rule," *McKenna v. Pacific Rail Serv.*, 32 F.3d 820, 825 (3d Cir. 1994). It may also be aided in its predictive task by "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Mills,* 406 F. Supp. 3d at 376 (quoting *Berrier*, 563 F.3d at 46 (quotation and citation omitted)).

### III.   DISCUSSION

#### A. Consumer Fraud Allegations and Rule 9(b)

##### 1. Standards under Rule 9(b)

Plaintiffs allege under the various states' consumer fraud statutes that SEA engaged in fraudulent omissions by failing to disclose the alleged defect in

---

[3]      I discuss the heightened Rule 9(b) standard of review, which applies only to the consumer fraud claims, in connection with those claims.  *See* Section III.A, *infra.*

the Class Dryers. (1AC ¶¶ 10, 12–15, 92, 97, 125, 128–29, 131–34, 136.) These claims sound in fraud, and therefore need satisfy not only Rule 8, *see* Section II.A, *supra*, but also the heightened standard set out in Federal Rule of Civil Procedure 9(b). *Morris v. BMW of N. Am., LLC*, 2014 WL 793550 at *3–4 (D.N.J. Feb. 21, 2014) (NJCFA must be pled in compliance with Rule 9(b)); *Pirozzi v. Apple, Inc.*, 913 F. Supp. 2d 840, 850 (N.D. Cal. 2012) (UCL, CFAL, and CLRA claims sound in fraud); *Kondash v. Kia Motors Am.*, 2016 WL 11246421 at *10 (S.D. Ohio June 24, 2016) (OCSPA claim must be pled with particularity);[4] *Two Old Hippies, LLC v. Catch the Bus, LLC*, 784 F. Supp. 2d 1200, 1207 (D.N.M. 2011) (Rule 9(b) pleading standard applies to NMUPA).; *Llado-Carreno v. Guidant Corp.*, 2011 WL 705403 at *5 (S.D. Fla. Feb. 22, 2011) (FDUTPA subject to Rule 9(b)); *Livingston v. Trustgard Ins.*, 988 F. Supp. 2d 873, 879 (N.D. Ill. 2013) (ICFA claim must be pled with particularity).

Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud," though "intent, knowledge, and other conditions of a person's mind may be alleged generally." For allegations about elements of a claim other than those regarding mental state, then, a plaintiff alleging fraud must "support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 20002)); *see also United States ex rel. Petras v. Simparel, Inc.*, 857, F.3d 497, 502 (3d Cir. 2017) (The purpose of 9(b) is to "place defendants on notice of the precise misconduct with which they are charged."). For allegations regarding mental state, however, only Rule 8 applies, so a plaintiff need only plead mental state allegations with sufficient

---

[4] I will not reach plaintiffs' contention that the OCSPA claims are not subject to the heightened Rule 9(b) standard (Opp at 5 n.2) because, as discussed below, plaintiffs fail to allege a violation of the OCSPA at all; they have disavowed their misrepresentation claims and make no omission claims. *See* Section III.D.1, *infra*.

factual content to render them plausible. *Iqbal*, 556 U.S. at 686–87; *see also* Fed. R. Civ. P. 9(b) (Despite the particularity requirement, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Finally, courts are more willing to find that a complaint complies with Rule 9(b) where it asserts fraudulent omissions, rather than misrepresentation.[5] "[A] plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Gelis v. Bayerische Motoren Wekre Aktiengesellschaft*, 2018 WL 6804506 at *8 (D.N.J. Oct. 30, 2018) (quoting *Kearney v. Bayerische Motoren Weke Aktiengesellschaft*, 2018 WL 4144683 at *10 (D.N.J. Aug. 29, 2018)). In such cases, "the Rule 9(b) standard is relaxed," *Kearney*, 2018 WL 4144683 at *10 (quoting *Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 385 (D.N.J. 2014)). That is especially true where, as here, "the factual information is peculiarly within the defendant's knowledge or control." *Gelis*, 2018 WL 4144683 at *8 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)). Thus, plaintiffs need not identify "specific samples of representations on which they relied which did *not* contain the allegedly omitted information," a standard which technically might encompass every statement of the defendants. *Majdipour v. Jaguar Land Rover N. Am., LLC*, 2013 WL 5574626 at *14 (D.N.J. Oct. 9, 2013) (emphasis added). Rather, a plaintiff typically need only allege "that the defendant failed to disclose material information[,] [and that omission] induced the plaintiff to enter into a transaction." *In re Caterpillar*, 2015 WL 4591236 at *31 (D.N.J. July 29, 2015).[6]

---

[5] Though the 1AC contains claims that SEA engaged in both misrepresentations and omissions, plaintiffs waive their misrepresentation claims in the Opposition and instead proceed only on a theory of omissions. *See* Opposition at 10 ("Plaintiff's statutory consumer protection claims are based on alleged fraud-by-omission.").

[6] Federal pleading standards aside, it must of course always be remembered that the legal adequacy of a state consumer fraud claim will be tested by underlying state law.

### 2. Claims of fraudulent omissions

Defendants raise three arguments purporting to establish that plaintiffs have failed to adequately allege a fraudulent omission. First, they claim that the Complaint asserts only misrepresentations, not omissions, under the NMUPA and the OCSPA. Second, they claim that plaintiffs failed to adequately allege that SEA was subject to a duty to disclose under the relevant state laws. Third, they claim that plaintiffs failed to adequately allege that SEA had knowledge of the defect before selling the dryers to the plaintiffs. I deal with these arguments in subsections a, b, and c, below.

### a. Omission claim pled under NMUTPA

SEA's first argument can be disposed of quickly.

SEA argues essentially that no omission claim is alleged under the NMUTPA. The complaint alleges, however, that SEA "engaged in . . . unfair or deceptive acts or practices as prohibited by the New Mexico UTPA . . . . [including] failing to state a material fact if doing so deceives or tends to deceive," (1AC ¶ 186); that "[d]efendant's scheme and <u>concealment</u> of the true characteristics and qualities of the Class Dryers and their drums were material to Plaintiffs and the Class," (*Id.* ¶ 187 (emphasis added)); and that SEA "had an ongoing duty . . . to disclose all material facts to the Defect . . . [but instead] intentionally concealed such knowledge from plaintiffs and the Class." (*Id.* ¶ 189.) These allegations do not use the word "omission," but are clearly claims of fraudulent omissions under NMUPA. As will be further discussed below, these not mere "recitations of law," as argued by SEA. The omission claim is supported by particularized facts—*i.e.,* allegations of just what the defendants failed to disclose—sufficient to satisfy Rule 9(b). The contention that plaintiffs have failed to set forth a claim of fraudulent omissions under the NMUPA must therefore be rejected.[7]

---

[7]     Not so under the OCSPA, however. I discuss the issues regarding the Ohio claims together in Section III.A.5, *infra.*

### b. Duties to disclose under state consumer protection statutes

SEA asserts that plaintiffs have failed to adequately allege that SEA owed a duty to disclose a defect which would arise after the expiration of SEA's one-year warranty. Whether each plaintiff was required to allege a duty to disclose depends on the consumer fraud statute of the state whose law governs a particular plaintiff's claims.

### i. Under FDUTPA, Plaintiffs are not required to plead a duty to disclose, so dismissal on these grounds is denied[8]

The parties dispute whether plaintiffs must allege a duty to disclose in order to state a claim under Florida's FDUTPA law. Plaintiffs cite *Gold v. Lumber Liquidators, Inc.*, 2019 WL 650426 at *4 (N.D. Cal. Jan. 2, 2019) for the proposition that "there is no duty to disclose requirement under FDUTPA," while SEA relies on *In re NJOY Consumer Class Action Litig.*, 2015 WL 12732461 at *14 (C.D. Cal. May 27, 2014) ("Where an FDUTPA claim is based on an omission, and the defendant had no duty to disclose the purportedly withheld information, the claim fails as a matter of law"), *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 (11th Cir. 2012) (concluding that "whether or not a duty to disclose is an element of a FDUTPA claim," plaintiff had only alleged a breach of a duty to disclose and plaintiff was not subject to such a duty), and *Parziale v. H.P., Inc.*, 445 F. Supp. 3d 435, 444–45 (N.D. Cal. 2020). There is a surprising paucity of Florida state case law on the issue; the Court's research

---

[8] SEA initially claimed in its motion to dismiss that the ICFA requires a duty to disclose, MTD 18–19, but in its reply it appears to have abandoned that contention in the face of *McMahan v. Deutsche Bank A.G.*, 938 F. Supp. 2d 795, 808 (N.D. Ill. 2013) ("Under the ICFA, it is not necessary to plead a common-law duty to disclose in order to state a claim for fraud based on an omission or concealment."). (*See* Reply at 7.)

Instead, SEA argues that the ICFA requires omissions "'prior to the dates of purchase,' not failure to disclose an alleged defect occurring after the expiration of a warranty." (Reply at 7.) SEA does not expand on why it believes plaintiffs do not meet that standard, and indeed it appears they easily do: Plaintiff Maria Keene of Illinois purchased her dryer in 2016, well after SEA allegedly learned of the defect in 2012 and elected not to disclose it. (1AC ¶¶ 68–69, 129.)

has disclosed no state court cases discussing it. The issue has been litigated in the federal courts, however, where some courts have held that "a duty to disclose is not an element of FDUTPA," *In re Takata Airbag Prods. Liab. Litig.*, 2016 WL 11662171 at *6 (S.D. Fla. Sept. 29, 2016) (quoting *Morris v. ADT Sec. Servs.*, 580 F. Supp. 2d 1305, 1310 (S.D. Fla. 2008)).

Like those federal courts, this Court is called upon to interpret FDUTPA without the benefit of state court decisions. "Under FDUTPA, the Florida Legislature has declared that deceptive or unfair methods of competition and practices in trade and commerce are unlawful." *Diamond Aircraft Indus., Inc. v. Horowitch*, 107 So. 3d 362, 367 (Fla. 2013). The purpose of the FDUTPA "is to protect individual consumers and certain defined business activities from deceptive, unfair, or unconscionable methods of business competition and trade practice." *Id.* The Florida Legislature "specifically articulated that the provisions of FDUTPA are to be construed liberally with this legislative purpose." *Id.* (citing § 501.202, Fla. Stat. (2011)).

"A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Count, Inc.*, 169 So. 3d 164, 167 (Fla. Dist. Ct. App. 2015) (quoting *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009)). The Florida Supreme Court has defined a "deception" as "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Thus, Florida case law appears to define the elements of an FDUTPA claim without any reference to a duty to disclose.

The absence of any explicit duty to disclose under FDUTPA is particularly striking against the background of the Florida common law of fraud. "Fraud based upon a failure to disclose material information exists only when there is a duty to make such a disclosure." *Pritchard v. Levin*, 2020 WL 2050691 at *2 (Fla. Dist. Ct. App. Apr. 29, 2020) (quoting *Garofalo v. Proskauer Rose LLP*, 253

So. 3d 2, 7 (Fla. Dist. Ct. App. 2018)). The duty "hinges on whether the defendant has done something toward the plaintiff or occupies a status with respect to the plaintiff that obligates the defendant to make a disclosure." *Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 442 (Fla. Dist. Ct. App. 2017). Such a duty arises "when one party has information that the other party has the right to know because of the fiduciary or other relationship of trust or confidence between them." *Ponzio*, 447 F. Supp. 3d at 233 (quoting *Temurian v. Piccolo*, 2019 WL 1763022 at *6 (S.D. Fla. Apr. 22, 2019)). "[W]here there is an arm's length transaction, the non-disclosure of material facts alone will not suffice as an 'actionable misrepresentation unless some artifice or trick has been employed to prevent the representee from making further independent inquiry, though non-disclosure of material facts may be fraudulent where the other party does not have an equal opportunity to become apprised of the fact." *Id.* (quoting *Taylor v. Am. Honda Motor. Co.*, 555 F. Supp. 59, 64 (M.D. Fla. 1982)).

The Florida Supreme Court's definition of "deception" in *PNR* sweeps far more broadly than the Florida common law of fraud. It is not confined to instances where the defendant would owe the plaintiff a fiduciary or trust relationship; rather, it encompasses all instances where the defendant's omission would mislead a consumer acting reasonably in the circumstances. The Florida Legislature that enacted FDUTPA, as well as the Florida Supreme Court which interpreted it, must be presumed to have been familiar with the common law background, and to have departed from it advisedly.

Further support may be found in a comparison between the common law of fraud and Fla. Stat. § 501.976, a provision in the FDUTPA which set out a non-exclusive list of conduct which is "unfair or deceptive" when undertaken by a car dealership. Under that provision, "[i]t is an unfair or deceptive act or practice, actionable under the [FDUTPA], for a [car] dealer to," among other things, "(6) Sell a vehicle without fully and conspicuously disclosing in writing . . . any warranty or guarantee terms," "(13) Sell a vehicle without disclosing to

the customer the actual year and model of the vehicle," or "(19) Fail to disclose damage to a new motor vehicle." This language appears to reach instances where a duty to disclose under Florida fraud-based common law would not. For instance, car dealers do not have a fiduciary duty to their customers, nor do they have a relationship of trust, and, at least as regards § 501.976(19), damage to a new motor vehicle may often be equally apparent to a purchaser and a car dealer. Yet the statute still obligates the dealer to disclose it.

Based on the Florida Supreme Court's interpretation of FDUTPA, the failure of any Florida court to have explicitly imposed a duty to disclose, and the incongruity between the enumerated instances of deceptive conduct in § 501.976 and Florida duty-to-disclose common law, I hold that FDUTPA does not have a duty to disclose requirement. The motion to dismiss the FDUTPA claim for failure to allege a duty to disclose is therefore denied.

### ii. Under NJCFA, dismissal is denied because the complaint adequately alleges a duty to disclose defects which manifest themselves post-warranty

SEA claims that the New Jersey CFA claim must be dismissed because NJCFA does not impose a duty to disclose defects that existed during the warranty period, but did not manifest themselves until thereafter.

"New Jersey precedent on this issue is unclear." *Ponzio*, 447 F. Supp. 3d at 244. Some courts have concluded that the fact that the defect only manifested itself outside of the warranty rules out an NJCFA claim, reasoning that recognizing such a claim would "essentially compel manufacturers and sellers to warrant their products and component parts beyond that to which the parties expressly agreed." *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 113 (App. Div. 2006). I do not believe, however, that the New Jersey Supreme Court would follow the rule set out in *Perkins* if this issue came before it.

Federal courts have concluded that *Perkins* should be limited to its facts. In *Perkins,* the allegedly substandard part never actually failed, and the plaintiff alleged only that the part could have—but had not—caused the

product to fail before the industry lifetime standard. *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 501–02 (D.N.J. 2009). The only published New Jersey state court decision to have discussed *Perkins* limits its holding to dismissal of claims based on defects that have not manifested themselves (though they might). *Muise v. GPU, Inc.*, 391 N.J. Super. 90, 100 (App. Div. 2007) (describing *Perkins* as holding that "a claim that a defect may, but has not, manifested itself until after the expiration of the warranty period cannot form the basis for a claim under the CFA."); *see also DeFillippo v. Whirlpool Corp.*, 2019 WL 4127162 at *7–8 (D.N.J. Aug. 30, 2019) (same); *Coba v. Ford Motor Co.*, 2016 WL 5746361 at *12 (D.N.J. Sept. 30, 2016) (duty of disclosure exists for warranted defects which the manufacturer knows are certain or highly likely to occur).

There are federal cases in New Jersey which have limited NJCFA claims to defects which occur within the warranty period. They have done so, however, largely because they concluded that the plaintiffs had not suffered damages, not because defendants's failure to disclose was not "unlawful conduct" under NJCFA. *See Nobile v. Ford Motor Co.*, 2011 WL 900119 at *6 (D.N.J. Mar. 14, 2011) ("where a vehicle component has outperformed the warranty period, the plaintiff cannot meet the pleading requirements for an 'ascertainable loss'"); *Ponzio*, 447 F. Supp. 3d at 244 ("the defendant's knowledge of a defect may be relevant in determining whether that defendant committed an unlawful act" but is "inapposite" when determining "whether the plaintiff suffered an ascertainable loss.").

SEA further argues that even if the expiration of the warranty does not *per se* extinguish any NJCFA claim, it limits it to those instances where "the manufacturer knows the failure is certain, or highly likely, to occur." (Reply at 8 (citing *Coba*, 2016 WL 5746361 at *12).) Courts have taken varying approaches to this issue. *See Maniscalco*, 627 F. Supp. 2d at 500–02 (finding NJCFA alleged where claim was that machine was "likely to fail"); *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 443 (D.N.J. 2012) (permitting NJCFA

claim where allegation is that the manufacturer "knew the product would fail"). As noted below, the plaintiffs have adequately alleged that SEA knew the dryers were defective. Plaintiffs also allege that the defect "manifest[s] in all or substantially all Class Dryers" and that the "Class Dryers suffer from the Defect and were prone to failure after the warranty period." (1AC ¶¶ 175–76.) I conclude these allegations adequately plead a claim under the NJCFA, because, if true, they establish that SEA knew the dryers were defective and were likely to fail due to that defect.

Furthermore, plaintiffs allege a safety risk resulting from the defect, (*Id.* ¶¶ 124, 175 (the defect raises "potentially an increased risk of fire" because of exposure of lint build-up to the heating element)). At least by negative implication, courts have agreed that such safety hazards give rise to an NJCFA claim regardless of the duration of the warranty. *See Perkins*, 383 N.J. Super. at 111–12 ("Our determination [that there is not NJCFA liability] is driven by the fact that, in this case, it was not alleged that the deterioration or failure of such a party represented a danger to others"); *id.* at 111 (applying its holding regarding the warranty only where "those circumstances in which safety concerns might be implicated"); *see also Ponzio*, 447 F. Supp. 3d at 243 (noting allegations could have been adequate if they included a claim of safety hazard). I am satisfied that such allegations are sufficient to satisfy Rule 9(b).

The motion to dismiss the NJCFA claim on these grounds is therefore denied.

### iii. Under California law, dismissal is denied because the complaint adequately alleges a duty to disclose a defect that affects the central function of the dryers and poses an unreasonable safety risk.

SEA argues that the complaint fails to allege the essential conditions for a duty to disclose under California law. California recognizes a duty to disclose (1) where the defect affects the central function of the product; or (2) where the defect presents an unreasonable safety hazard. (Reply at 8); *see also Hodsdon*

*v. Mars, Inc.*, 891 F.3d 857, 865 (9th Cir. 2018); *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1097 (N.D. Cal. 2007).[9]

Regarding the "central function" test, SEA asserts that under *Hodsdon v. Mars*, a duty to disclose must both "relate to a product's central function" and "arise during the warranty period." (Reply at 8.) That mischaracterizes *Hodsdon*, which concluded that California law recognizes a duty to disclose defects which go to the central function of the product regardless of the warranty period, so long as (a) the omission was "material" and (b) the defendant was either the plaintiffs' fiduciary, had exclusive knowledge of facts not accessible to the plaintiff, actively concealed a fact, or made partial representations. 891 F.3d at 862–63; *see also Sosenko v. LG Elecs., U.S.A., Inc.*, 2019 WL 6118355 at \*3 n.2 (C.D. Cal. Aug. 29, 2019) ("In *Hodsdon v. Mars, Inc.*, however, the Ninth Circuit recognized . . . that manufacturers may also have a duty to disclose defects manifesting beyond the express warranty period that affect a product's 'central functionality.'").

While the *Hodsdon* court did admit to some uncertainty regarding the state of California law, a review of the California intermediate appellate court decisions on this subject suggests that the question is not really so close. In *Rutledge v. Hewlett-Packard Co.*, 190 Cal. Rptr. 3d 411 (Ct. App. 2015), the court clearly rejected the defendant's assertion that there was no duty to disclose regarding a product that had functioned properly for the duration of its warranty. *Rutlege* held that "[t]he question under the UCL is related to HP's conduct in failing to disclose the faulty inverter, not on whether the notebook's computer functioned for one year. HP's argument that the expiration of the warranty period precludes a claim for fraudulent concealment under the UCL is incorrect." *Id.* at 421.

---

[9] Plaintiffs also claim that SEA engaged in active concealment, but because they satisfy the other two methods of establishing a duty to disclose, I will not reach that issue.

17

Plaintiffs here allege that the defect was material, that the defect went to the central functionality of the dryer, and that SEA had exclusive knowledge of facts not known to them, namely, the condition of the dryer. (1AC ¶¶ 1, 3, 27, 67 (dryer destroys clothing and exposes heating element, thereby eliminating its central function)); (*Id.* ¶ 175 (cracked drums are material to a reasonable consumer)); (*id.* ¶¶ 115–23 (SEA knew about defect)). Given *Rutledge*'s and *Hodsdon*'s conclusions that the defect need not have manifested itself during the duration of the warranty, plaintiffs have adequately pled a claim under the UCL, CFAL, and CLRA.

Plaintiffs also adequately allege a claim based on a safety defect. SEA claims that California courts require that the safety hazard have actually materialized. Here, for example, they would require that plaintiffs show a particular fire that started as a result of lint buildup. Again, the very case SEA cites in support comes to the opposite conclusion. *Williams v. Yamaha Motor Co.* makes clear that "[w]here a plaintiff alleges a sufficiently close nexus between the claimed defect and the alleged safety issue, the injury risk *need not have come to fruition.*" 851 F.3d 1015, 1028 (9th Cir. 2017) (emphasis added). Though *Williams* did criticize the complaint for its "notable omission" of any instance where the defect caused a fire, it was in the context of rejecting as implausible the plaintiffs' allegation that the defect would create a fire risk in every motor. *Id* at 1028–29.

Here, in contrast, the plaintiffs adequately allege a safety risk. They allege that the defect causes the dryers' drum to crack, creating a hole through which lint could fall into the heating element. (1AC ¶¶ 104, 106.) They allege that lint buildup in the heating element could catch on fire. (*Id.* ¶¶ 106, 175.) Those are factual allegations which make out a plausible claim, rising above mere conclusions or speculation, that the defect causes a fire risk. *See Iqbal*, 556 U.S. at 679. It is true that plaintiffs have not alleged any particular instances where the defect caused a fire. That may suggest a future weakness

18

in their case, but their theory of fire risk is sufficiently plausible to state a claim at this preliminary stage.

The motion to dismiss the claims of fraud under the CLRA, CFAL, and UCL is therefore denied.

### c. The complaint adequately alleges that SEA knew of the defect at the time of sale (all States)

The parties agree that under each state's law, plaintiffs must, as a part of pleading their fraud claim, plead "sufficient factual matter, taken as true, to support a plausible inference that Defendant 'was aware of a defect at the time of sale.'" *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 231 (D.N.J. 2020) (quoting *Grodzitsky v. Am. Honda Motor. Co.*, 2013 WL 2631326, at *6–7 (C.D. Cal. June 12, 2013)). As noted above, allegations of knowledge, even in a claim for fraud, are subject only to the Federal Rule 8(a) plausibility standard. *Iqbal*, 556 U.S. at 686–87; Fed. R. Civ. P. 9(b) (mental states need only be pled generally).

Plaintiffs allege that SEA conducts pre-release testing on dryer components, including dryer drums, and that such tests are designed to verify that the dryers are defect free. (1AC ¶¶ 107–08.) This allegation is supported by further factual allegations regarding SEA's testing facilities, including their location (Suwon, South Korea), the kinds of testing undertaken there (shaking tests, extreme conditions, noise monitoring), and that such testing would have revealed the defect to SEA. (*Id.* ¶¶ 109, 111, 113.) Plaintiffs also allege based on "reports in the public domain," as well as and information and belief, that SEA received calls, warranty claims, and other correspondence as early as 2012 regarding the defect, (*id.* ¶ 116), as well as a variety of consumer complaints spanning from 2012–2018 across various internet media (*id.* ¶¶ 115–23). Finally, they allege that the defect affects all of the Class Dryers and that all Class Dryer model numbers contain the same defective components, such that evidence of the defect in one model should be evidence of a defect in the others. (*Id.* ¶¶ 1, 7 & Attachment A.)

19

These allegations are sufficient to plead knowledge under Rules 8 and 9(b). In a strikingly similar case, *Ponzio v. Mercedes-Benz*, the court found nearly identical allegations adequate to plead knowledge. 447 F. Supp. 3d at 227. The *Ponzio* plaintiffs alleged on information and belief that the defendants would have been required, based on their quality control standards, to subject defective car paint to certain tests that would have revealed the defect. *Id.* at 227–28. The court rejected the defendant's argument that the plaintiffs had failed to specifically allege that the testing did in fact uncover the defect, noting that courts "must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" *Id.* at 228 (quoting *Craftmatic Securities Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)). *Ponzio* required that a plaintiff provide only "general allegations of knowledge suffic[ient] to [permit the court to] infer what defendant is alleged to have known and when," *Id.* (quoting *BK Trucking Co. v. PACCAR, Inc.*, 2016 WL 3566723, at *8 (D.N.J. June 30, 2016)). Ultimately, because the plaintiffs had alleged "details regarding the testing performed" and that "the results of that testing are in the exclusive custody and control of Mercedes," they were held to have satisfied their obligations under Rules 8 and 9(b). *Id.* Importantly, however, the *Ponzio* court required more than mere assumptions; those plaintiffs, it noted, brought specific allegations explaining Mercedes' product testing process and how Mercedes' likely course of testing "'would have' revealed the Paint defect, rather than simply alleging certain testing 'must have' revealed a defect." *Id.* at 228–29.

*Ponzio* also considered allegations that the defendant had received consumer complaints. Such complaints, it held, while "insufficient to establish knowledge, by themselves," can serve to support allegations of knowledge, especially when they contain information which indicates "where or how the complaints were made" and "other information [which] 'could have alerted [defendant] to the defect.'" *Id.* at 230 (quoting *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1147 (9th Cir. 2012)). Indeed, at least one court seems to have

required less. *See BK Trucking Co. v. PACCAR*, 2016 WL 3566723 at *9 (finding adequate a plaintiff's allegations that a defective engine underwent a significant amount of testing, and that the defendants collected fault code data which would have made it easy for the defendants to recognize and track an alleged defect).

Plaintiffs here, like those in *Ponzio*, offer specific allegations describing SEA's testing facilities and the tests conducted there, including exposure to extreme conditions, noise monitoring, and shaking; alleges that the tests are designed to identify defects and product failures; and states that the tests are undertaken on components, including drums, typically used in dryers. Such allegations are sufficient to make plausible the claim that the Class Dryers were tested and that the test caught the defect prior to the time of sale. While plaintiffs cannot now prove that SEA in fact knew of the defect, they have alleged enough facts to meet their pleading burden, particularly since the relevant facts regarding testing are in SEA's possession.[10]

Concededly, certain of plaintiffs' allegations are not be as detailed as those in *Ponzio.* Still, they are sufficient to make plausible their claim that testing would have (as opposed to merely could have) uncovered the defect. *See Ponzio*, 447 F. Supp. 3d at 228. Plaintiffs here allege that SEA's testing facility conducts testing procedures "on the drums to be used in its dryers" such as shaking them, exposing them to extreme conditions, and monitoring the amount of noise they emit. (1AC ¶ 107.) It is reasonable, if not necessary, to infer that such tests would have revealed a defect which manifests itself as a result of excessive shaking and easily-cracked, thin-gauge steel, and which, once manifested, emits a great deal of noise. (*Id.* ¶¶ 103–04, 107–08.); *see PACCAR*, 2016 WL 3566723 at *9 (allegations of significant amount of testing sufficient to make plausible that testing would have discovered the defect).

---

[10] In coming to this conclusion, I am not required to give credit to plaintiffs' somewhat speculative allegation that SEA "likely conducted pre- and post-release testing on the incoming batches of components used in the Class Dryers." Those facts, assuming they exist, should emerge in discovery.

Contrary to SEA's assertions, these allegations are far more detailed, and have far more factual support, than the allegations in cases where courts have found claims of pre- and post-release testing to be conclusory or otherwise insufficient. *See, e.g., Morris v. BMW of N. Am.*, 2014 WL 793550 at *6 (plaintiff alleged without factual support that BMW discovered defect by virtue of its "pre- and post-release testing, industry testing, warranty data, consumer complaints . . . as well as through sources not now available to Plaintiff.").

Plaintiffs have therefore have adequately pled that SEA had time-of-sale knowledge based on SEA's extensive testing of its dryers.[11]

---

[11]    Because these allegations of contemporaneous knowledge are sufficient, it is less critical to weigh the remaining allegations of knowledge. They are, however, less convincing.

Plaintiffs' allegation on information and belief that SEA "received calls, communications, correspondence, or warranty claims from consumers regarding the Defect with the Class Dryers as early as 2012" lacks any factual support, and thus lends no weight to plaintiffs' allegations that SEA knew of the defect. True, such allegations can help to establish knowledge when they "assert where and when consumer complaints were made" and how they could have "alerted [a defendant] to the defect." *Ponzio*, 447 F. Supp. 3d at 230. Allegations pled on information and belief, however, must be "reasonably based" on "specific facts" set forth elsewhere in the complaint, *Rapid Models & Prototypes, Inc. v. Innovated Solutions*, 71 F. Supp. 3d 492, 504 n.7 (D.N.J. 2014), and plaintiffs offer nothing suggesting such calls, correspondence, or warranty claims were made apart from this lone, conclusory statement.

Similarly, plaintiffs' allegations regarding online consumer complaints do not substantially support their claims of knowledge. The earliest online complaints submitted on SEA's website were from 2017, after all of the plaintiffs had already purchased their dryers, with the exception of plaintiff Dowd, who purchased hers on May 10, 2017. (*See* 1AC ¶¶ 60–61, 119.) Even as regards plaintiff Dowd, only two complaints on SEA's website were posted prior to May 10, 2017 (*id.* ¶ 119 ns. 7–8 (posted January 24 and 26, 2017)), which hardly constitutes a deluge of criticism. I cannot conclude SEA knew about the defect simply because two customers complained about the dryers on the internet.

Finally, plaintiffs also allege a number of complaints on third-party websites, dating from as early as 2012. But "[c]ourts in this district have repeatedly found that consumer complaints on third-party websites are not sufficient to [permit a fact finder to] infer a manufacturer's knowledge of a product defect where there are no allegations that the manufacturer saw such complaints." *Granillo v. FCA U.S. LLC*, 2016 WL

SEA's last argument is that plaintiffs' allegations relate to a number of different dryer models and that plaintiffs have not alleged facts to support their contention that the dryers should all be considered "substantially similar." Reply at 5. This is simply incorrect; the complaint does allege that "All Class Dryers utilize the same component parts or the same manufacturing process which gives rise to the Defect." (1AC ¶ 7.) As to a mass-produced consumer product, such an allegation is not implausible. It can and will, of course, be explored in discovery.

The motion to dismiss, to the extent it is based on the inadequacy of the allegations regarding SEA's time-of-sale knowledge of the defect in the various models of dryers, is therefore denied.

### 3. Other fraudulent omissions issues: California UCL Claim

SEA additionally moves to dismiss plaintiffs' claim under the UCL. The UCL proscribes (a) unlawful, (b) unfair, or (c) fraudulent business acts or practices. Each of the three prongs of the statute sets forth a "separate and distinct theory of liability." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). Claims under the unlawful and unfair prongs do not sound in fraud and thus are held only to the ordinary pleading requirements of Rule 8. *Castillo v. Seagate Tech., LLC*, 2016 WL 9280242 at *6 (N.D. Cal. Sep. 14, 2016). Plaintiffs have adequately pled their UCL claim based in fraud, as discussed *supra*; as will be discussed below, they also adequately allege UCL claims based on SEA's allegedly unlawful and unfair business practices.

"[U]nlawful business practices that are actionable under the UCL include anything that can properly be called a business practice and that at the same time is forbidden by law." *Blue Cross of Cal., Inc. v. Super. Ct.*, 180 Cal. App. 4th 138, 150 (Cal. Ct. App. 2009). The UCL "authorizes lawsuits to remedy

---

9405772 at *9 (D.N.J. Aug. 29, 2016); *Wiseberg v. Toyota Motor Corp.*, 2012 WL 1108542 at *13 (D.N.J. Mar. 30, 2012) ("While anonymous internet complaints could be relevant to the issue of knowledge, it must be shown that Toyota was aware of these complaints."). Plaintiffs offer no facts suggesting that anyone at SEA saw the comments on these third party websites.

unlawful conduct even if the underlying statute that renders the conduct unlawful does not itself create an independent right of action." *Id.*

SEA asserts that plaintiffs have failed to adequately allege a claim under the UCL because plaintiffs merely "list[ed] statutes without articulating specific facts to satisfy each element" of those statutes. (Reply at 10 (citing *Montreal v. GMAC Mortgage, LLC*, 948 F. Supp. 2d 1069, 1076 (S.D. Cal. 2013)).) That description of the complaint is inaccurate. In the UCL count of the 1AC, plaintiffs "re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint as though set forth fully herein" (1AC ¶ 146), and state that the UCL claim is predicated on violations of the CLRA and CFAL, (*id.* ¶¶ 151–52), as well as California warranty law as applied through the Magnuson-Moss Warranty Act, (*id.* ¶ 151 (asserting violations of California Commercial Code § 2313, the warranties provision)). As has been discussed in the fraud section, *supra*, and will be discussed in the remainder of this opinion, plaintiffs have set forth specific facts satisfying pleading requirements for all of those claims, and as such have pled unlawful conduct under the UCL.

As for the "unfair conduct" prong of the UCL, California courts are in considerable disagreement over the proper test. They apply either (1) a "balancing test" considering the "reasons, justifications and motives of the alleged wrongdoer" compared to the practice's impact on its alleged victim, (2) a "competitor tethering test," where unfairness must be related to a legislatively declared policy or a threatened impact on competition, or (3) the test set out in section 5 of the Federal Trade Commission Act, which asks if the consumer injury is substantial, if the injury is outweighed by countervailing benefits, and if the consumers themselves could have reasonably avoided the injury. *Morgan v. AT&T Wireless Services, Inc.*, 177 Cal. App. 4th 1235, 1254–55 (Cal. Ct. App. 2009). Since California courts have not harmonized these three approaches to defining "unfair" conduct under the UCL, courts have tended to approach them as alternative methods of pleading unfairness. *See Hodsdon*, 891 F.3d at 866

24

(considering in the alternative claims based on the tethering and balancing tests).

Plaintiffs have adequately pled claims under the balancing test and the section 5 test.[12] Plaintiffs point to "substantial harm" they have endured because SEA marketed and sold its dryers as premium, durable dryers despite the fact that the dryers last well short of an expected useful life, as well as the safety hazard that the dryers pose, and, as will be discussed below, the unconscionability of SEA's one-year warranty. (1AC ¶¶ 3, 6, 10, 13, 15–16, 93–96, 107–19.) They additionally allege that they could not have avoided the injury because all of the relevant information was in SEA's control, and that the benefits to consumers from SEA's actions are outweighed by the injury to plaintiffs. *Id.* ¶¶ 148, 150. They support these claims with factual allegations of the harm they have suffered, the defect in the dryers, and SEA's alleged failure to disclose the defect despite knowing it would prevent plaintiffs from receiving the benefit of the bargain.

SEA asserts that these allegations mirror the conclusory allegations which were found insufficient in *Park-Kim Daikin Indus.*, 2016 U.S. Dist. LEXIS 158056 (C.D. Cal. Nov. 14, 2016). There, however, the complaint merely alleged that "Defendants engaged in unlawful, fraudulent, and unfair business practices," and the plaintiffs attempted to supplement those allegations in their brief, where they argued that the defendant failed to honor warranties for products which it knew were defective. *Id. Park-Kim* made clear, however, that if a plaintiff "specifically ple[d] which alleged acts were unfair" and "that the utility of the defendant's conduct is outweighed by its harm," then they would

---

[12] It is clear, however, that plaintiffs have failed to allege any "legislatively declared policy" or "impact on competition," and so they have not alleged a claim under the competitor tethering test. Indeed, the 1AC makes no reference to SEA's competitors at all, or to any policies declared by the California legislature which SEA has violated.

have adequately pled the claim. *Id.* at \*42–43. That is what the plaintiffs have done here.

The motion to dismiss the claim under the California UCL is therefore denied.

### 4. Other fraudulent omissions issues: California CLRA Notice Requirements

California Civil Code § 1782(a) requires that, to maintain a claim under the CLRA, a consumer must notify an alleged wrongdoer that her actions are violations of the statute thirty days prior to the commencement of the action and demand that the wrongdoer rectify the violation. No action for damages under the CLRA can be maintained absent this prior notice. Cal. Civ. Code § 1782(b); *Outboard Marine Corp. v. Super. Ct.*, 52 Cal. App. 3d 30, 41 (Cal. Ct. App. 1975). Failure to comply with the notice requirement, then, requires dismissal. *See Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 949–50 (S.D. Cal. 2007). Indeed, some federal courts in California have held that non-compliance requires dismissal with prejudice. *Id.* at 950; *see also, e.g.*, *Von Grabe v. Sprint*, 312 F. Supp. 2d 1285, 1304 (S.D. Cal. 2003).

Dismissal is not appropriate here, however. California Civil Code § 1782(d) permits an action for injunctive relief to be brought without regard to the requirements of § 1782(a). Section 1782(d) further permits a plaintiff to amend the complaint without leave of court 30 days after bringing a claim for injunctive relief to add a request for damages. The 1AC as filed seeks only injunctive relief, although it states an intent to amend under § 1782(d).[13] (1AC ¶ 169 ("Plaintiffs have provided Samsung with notice of its violations . . . and currently seek injunctive relief. After the 30-day notice period expires, Plaintiffs will amend this complaint to seek monetary damages under the CLRA.").)

---

[13] SEA misleadingly quotes the 1AC as stating that the plaintiffs are "entitled to . . . monetary relief." (Reply at 17 (quoting 1AC ¶ 171).) The 1AC makes clear that plaintiffs are not seeking monetary relief at this time.

The motion to dismiss the CLRA claim based on failure to comply with the notice requirement is therefore denied.

### 5. Other fraudulent omissions issues: Ohio

#### a. OCSPA claim inadequately pled and subsumed by OPLA

The plaintiffs, in their opposition, have abandoned any claim of affirmative misrepresentations under the state consumer fraud statutes. (Opp. at 4–5). But their claim under OCSPA is clearly pled as a misrepresentation claim. *See* (*Id.* ¶197–98 (describing SEA's "unfair and deceptive trade practices" as, *inter alia*, "representing that the Class Dryers have characteristics . . . which they do not have; representing that the Class Dryers are of a particular standard . . . .")) Plaintiffs have not even really purported to assert an OCSPA claim of fraudulent omissions. The term "omission" occurs only in the allegation that "[m]aterial omissions and misrepresentations concerning a product constitute a violation of the statute," which is no more than a boilerplate statement of the law. (*Id.* ¶ 200.) Because the complaint does not adequately plead an omission under the OCSPA, and because plaintiffs have abandoned any misrepresentation claim, no OCSPA claim remains.

Even assuming arguendo that the 1AC asserts a fraudulent omission OCSPA claim, there is a more fundamental problem. The Ohio Products Liability Act ("OPLA") abrogates common law products liability claims in Ohio, including OCSPA claims, which are "primarily" rooted in product liability claims. *Meta v. Target Corp.*, 74 F. Supp. 3d 858, 861 (N.D. Ohio 2015). To qualify as a "product liability claim" within the meaning of OPLA, a claim must "allege[] damages other than economic ones." *LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996); *Huffman v. Electrolux N. Am., Inc.*, 961 F. Supp. 2d 875, 879 (N.D. Ohio 2013). Thus, only if a plaintiff seeks noneconomic damages does OPLA subsume and therefore bar the claim. *LaPuma*, 661 N.E.2d at 716 ("a failure to allege other than economic damages does not destroy the claim, but rather removes it from the purview of [OPLA].");

27

*Volovetz v. Tremco Barrier Solutions, Inc.*, 74 N.E.3d 743, 752–53 (Ohio Ct. App. 2016).

The 1AC explicitly seeks up to five thousand dollars in "noneconomic damages." (1AC ¶¶ 135, 204.) Plaintiffs also seek to recover for damage to their clothing which was caused by the defect; this part of the claim, they say, saves their noneconomic damages claim, which is not primary but secondary. That is inconsistent with Ohio state law, which makes clear that OPLA applies to any claim that "allege[s] damages other than economic ones." *LaPuma*, 661 N.E.2d at 716. Plaintiffs' approach is, in my view, inconsistent with the evident statutory intent to shift the center of gravity of product-based claims to the OPLA.[14]

The court can imagine various sorts of surgery that would theoretically preserve an OCSPA claim from the overriding effect of OPLA. But if this claim is to be modified, plaintiffs as masters of their case should do so by amendment. If they go forward on a modified OCSPA theory, many additional difficulties are likely to arise.[15] If they elect to go forward on an OPLA theory, many objections to an OCSPA claim may prove moot.

---

[14]    Plaintiffs rely on *Meta v. Target, supra,* but it is not on point. That case stands only for the proposition that a plaintiff who brings a claim under OPLA may add a supplemental claim for economic damages under Ohio Rev. Code § 2307.79(A). 74 F. Supp. 3d at 863–64.

[15]    Even if plaintiffs' OCSPA claim were not abrogated by OPLA, other obstacles would likely remain, and would need to be dealt with in any amended version. To the extent the claim is for damages, it is untimely. Ohio Rev. Code Ann. § 1345.10(C) (two-year statute of limitations for OCSPA damages claims); *Rosenow v. Shutrump & Assocs.*, 839 N.E.2d 82, 86 (Ohio Ct. App. 2005) (no discovery rule applies). The claim for rescission lacks the essential allegation that the dryers have not undergone a substantial change in condition. *Lloyd v. Buick Youngstown GMC Truck Co.*, 686 N.E.2d 350, 353 (Ohio Ct. App. 1996) (to plead rescission, plaintiff must allege no substantial change in condition of goods).

Furthermore, Ohio Rev. Code § 1345.09(B), which states that a consumer "may rescind the transaction or recover, but not in a class action, three times the amount of the consumer's actual economic damages or two hundred dollars . . . . ," appears to rule out the treble and statutory damages remedies that plaintiffs seek. *Felix v. Ganley Chevrolet, Inc.*, 49 N.E.3d 1224, 1231 (Ohio 2015). That provision may not rule out a

As things stand, however, the OCSPA claim is dismissed.

### i.    ODTPA claim dismissed for lack of consumer standing

The ODTPA claims will be dismissed because consumers do not have standing to sue under that statute.

"A broad majority of the courts to directly address this issue have held that the ODTPA does not give consumers standing." *Hamilton v. Ulta Beauty, Inc.*, 2018 WL 3093527 at *2 (N.D. Ohio June 21, 2018); *Smith v. Smith & Nephew, Inc.*, 5 F. Supp. 3d 930, 932 (S.D. Ohio 2014); *Allen v. Andersen Windows, Inc.*, 913 F. Supp. 2d 490, 513 (S.D. Ohio 2012). Ohio state courts have made clear that they regard the ODTPA as very similar to the federal Lanham Act, which courts unanimously agree does not provide standing to consumers as such. *Holbrook v. Louisiana-Pacific Corp.*, 533 Fed. Appx. 493, 497 (6th Cir. 2013) (citing *Dawson v. Blockbuster, Inc.*, 2006 WL 1061769 at *3–4 (Ohio Ct. App. 2006)). They also reason that the definition of "person" in the ODTPA is limited to "legal or commercial entit[ies]," further suggesting exclusion of ordinary consumers. *Hamilton*, 2018 WL 3093527 at *3; *see also Gascho v. Global Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 698 (S.D. Ohio 2012). Finally, courts reason that the scope of ODTPA should be limited to avoid overlap with the OCSPA; if the ODTPA applied to consumers it would render the OCSPA superfluous. *Hamilton*, 2018 WL 3093527 at *3; *Robins v. Global Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 650 (N.D. Ohio 2012).

Plaintiffs identify Ohio state court cases from several decades ago which, without addressing standing, appear to countenance ODTPA claims by consumers. More recent decisions that actually address the issue, however, have made it clear that current Ohio law rules out consumer standing under ODTPA. *Torrance v. Rom*, 2020 WL 4533601 at *10 (Ohio Ct. App. 2020); *Ball*, 7 N.E.3d at 1253.

---

rescission remedy, however. Plaintiffs would also have to establish that SEA was on notice of OCSPA liability. *See State ex rel. Brown v. Lyons*, 332 N.E.2d 380 (Ohio Ct. Com. Pls. 1974).

Because this exclusion is categorical, amendment would be futile. Plaintiffs' ODTPA claim is therefore dismissed with prejudice.

### B. Federal Magnuson-Moss Warranty Act/Breach of Warranty

The MMWA is a federal statute which serves as a vehicle for consumers to assert state law breach of warranty claims in federal court. 15 U.S.C. § 2310(d)(1). To state a claim under the MMWA, plaintiffs must adequately plead that: "(1) the item at issue was subject to a warranty; (2) the item did not conform to the warranty; (3) the seller was given a reasonable opportunity to cure any defects; and (4) the seller failed to cure the defects within a reasonable time or a reasonable number of attempts." *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 601 n.11 (D.N.J. 2016). While plaintiffs admit that their claims arose after the one-year duration of the warranty had expired, they assert, and defendants admit, that they may nevertheless state a claim if they properly allege that the warranty was unconscionable. *See in re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160 at *11 (D.N.J. May 8, 2017); *Skeen v. BMW of N. Am., LLC*, 2014 WL 283628 at *12 (D.N.J. Jan. 24, 2014).

### 1. Substantive and procedural unconscionability under MMWA

In order to adequately allege that a contract is unconscionable under the relevant state law, plaintiffs are required to plead substantive unconscionability, *i.e.,* that a contract term "is excessively disproportionate, involving an exchange of obligations so one-sided as to shock the court's conscience." *Gelis*, 2018 WL 6804506 at *6 (D.N.J. Oct. 30, 2018). Plaintiffs are also required to plead procedural unconscionability, *i.e.,* that the plaintiffs entered into the unconscionable provision as a result of "oppression" which "arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice," *Skeen*, 2014 WL 283628 at *13. *See Aron v. U-Haul Co. of California*, 143 Cal. App. 4th 796, 808 (2006) (California state law requires pleading both substantive and procedural unconscionability); *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 616 (N.D. Ohio 2016) (same for Ohio); *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622

(Ill. 2006) (same for Illinois); *Zephyr Haven Health & Rehab Ctr., Inc. v. Hardin*, 122 So.3d 916 (Fla. Dist. Ct. App. 2013) (same for Florida); *Fiser v. Dell Computer Corp.*, 188 P.3d 1215, 1221 (N.M. 2008) (same for New Mexico).

Plaintiffs adequately plead procedural unconscionability. Procedural unconscionability can arise where the transaction in question "include[s] a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." *Rodriguez v. Raymours Furniture Co.*, 225 N.J. 343, 366 (2016). Whether a bargaining process is unfair is a fact-specific inquiry; a court must compare the facts and allegations in this case to past cases where unconscionability was found. *See Laibow v. Menasche*, 2019 WL 6243368 at *8 (D.N.J. Nov. 21, 2019) (citing *Delta Funding Corp. v. Harris*, 912 A.2d 104, 110–11 (N.J. 2006)). Having undertaken such a comparison here, the Court is convinced that plaintiffs have adequately alleged that the bargaining process between themselves and SEA was procedurally unconscionable.

*Gelis* found a warranty procedurally unconscionable where (1) the defendant, an automobile manufacturer, was more sophisticated than the plaintiffs; (2) the defendant knew about an alleged defect at the time of sale that the plaintiffs did not know about; (3) the plaintiffs lacked a meaningful opportunity to negotiate the time and mileage requirements of a warranty; and (4) plaintiffs had no power to modify the warranty's terms. 2018 WL 6804506 at *6. Other courts have agreed on similar facts. *See, e.g., Henderson v. Volvo Cars of N.M., LLC*, 2010 WL 2925913 at *8–9 (D.N.J. July 21, 2010) (manufacturer's knowledge that part will fail after expiration of warranty period in addition to allegations of disparity in bargaining power and that class members had no meaningful choice in negotiating warranty period were sufficient for unconscionability); *see also Payne v. Fujifilm U.S.A., Inc.*, 2007 WL 4591281 at *5 (D.N.J. Dec. 28, 2007) (same). Here, plaintiffs have alleged that they had no meaningful opportunity to participate in creating the warranty,

that SEA is a national enterprise which dictated the warranty's terms, that they could not alter the warranty, and that SEA had superior knowledge of the defect and concealed it. (1AC ¶ 227.)

I am not convinced otherwise by cases cited by SEA which dismissed similar allegations for lack of factual support. *See Amato v. Subaru of Am., Inc.*, 2019 WL 6607148 at *10 (D.N.J. Dec. 5, 2019) (noting that "the Complaint lacks any supporting facts as to their choices and bargaining power"); *Argabright*, 201 F. Supp. 3d at 596 (same); *In re Caterpillar, Inc.*, 2015 WL 4591236 at *22 (D.N.J. July 29, 2015) ("Plaintiffs' allegations offered in support of procedural unconscionability are entirely conclusory"); *Alban v. BMW*, 2011 WL 900114 at *9 (D.N.J. Mar. 15, 2011) (plaintiffs alleged conclusorily that they had no meaningful choice to determine the warranty and that there was a gross disparity in bargaining power between the parties). Here, plaintiffs offer sufficient factual allegations in support of their claims of procedural unconscionability. As noted in Section III.A.2.c, they have adequately alleged that SEA had knowledge of the defect and failed to disclose it. They also offer factual support for their allegations that they had no meaningful opportunity to participate in creating the warranty or alter its terms in any way; for example, the warranty is included in product packaging "on a pre-printed form" and the "[c]onsumers are not involved in the preparation of the warranty." (1AC ¶ 99.) They additionally allege facts in support of SEA's superior bargaining power, such as SEA's status as a major corporation. (*Id.* ¶ 100.)

Nor am I convinced by SEA's reliance on *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 673 (3d Cir. 2002) for the proposition that consumers have bargaining power in such circumstances because they can purchase dryers from other companies. *Werwinski* simply held that Pennsylvania law did not distinguish between consumers and businesses in applying the economic loss doctrine to fraudulent concealment and consumer protection claims. *Id.* at 673–74. The Third Circuit considered whether consumers had surrendered their right to tort claims by entering into a contract with a company, not

whether it is unconscionable for a corporation to use its superior bargaining power to allegedly mislead consumers into an unfair and unnegotiable warranty. *Id.* I find that plaintiffs have adequately pled procedural unconscionability.

Similarly, I find the plaintiffs have adequately pled substantive unconscionability. Substantive unconscionability exists where a "term is excessively disproportionate, involving an exchange of obligations so one-sided as to shock the court's conscience." *Gelis*, 2018 WL 6804506 at *6. Like procedural unconscionability, substantive unconscionability "is an amorphous concept obviously designed to establish a broad business ethic," and "the standard of conduct that the term unconscionable implies is a lack of good faith, honesty in fact and observance of fair dealing." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994). The court in *Gelis* found that although the defendant's warranty provision was not facially unconscionable based purely on its terms, it was nevertheless substantively unconscionable because the defendant set it "with specific knowledge that class engines would fail after the end of the warranty period but before the vehicle's expected useful life." 2018 WL 6804506 at *6. The court rejected the defendant's assertion that warranties do not cover defects after the warranty's time period has elapsed even if the defect existed prior to expiration, concluding that the defendant had unconscionably manipulated the plaintiffs. *Id.*; *see also Henderson*, 2010 WL 2925913 at *9 (finding such allegations sufficient if paired with procedural unconscionability).

It is true that some federal courts in this district have concluded that "'a finding of unconscionability cannot be premised solely upon allegations that defendant knew that a defect in the product *might* arise,' and created a limited warranty designed to avoid fixing the defect." *Argabright*, 201 F. Supp. 3d at 597 (emphasis added) (quoting *Suddreth v. Mercedes-Benz*, 2011 WL 5240965 at *3 (D.N.J. Oct. 31, 2011)); *see also Majdipour v. Jaguar*, 2013 WL 5574626 at *20 (D.N.J. Oct. 9, 2013); *Nelson v. Nissan N. Am., Inc.*, 894 F. Supp. 2d 558,

565–66 (D.N.J. 2012); *Alban*, 2011 WL 900114 at *9. These courts reason that manufacturers are entitled to "predict rates of failure of particular parts in order to price warranties" and "a rule making failure of parts actionable based on such 'knowledge' would render meaningless" the limitations built into a warranty's coverage. *Id.* (quoting *T.J. McDermott Transp. Co. v. Cummins, Inc.*, 2015 WL 1119475 at *9 (D.N.J. Mar. 11, 2015)). They are all distinguishable from *Gelis*, *Henderson*, and the facts of this case, however, in that substantive unconscionability based on a warranty designed to avoid responsibility for a *known* defect, if paired with *procedural unconscionability as well*, suffices to survive a motion to dismiss. *See Amato*, 2019 WL 6607148 at *10; *Henderson*, 2010 WL 2925913 at *9; *Suddreth*, 2011 WL 5440965 at *4.

As set forth above, plaintiffs have adequately pled both procedural and substantive unconscionability.

### 2. Reasonable opportunity to cure under MMWA

SEA also claims that plaintiffs failed to give them a reasonable opportunity to cure the defect in the dryers before bringing their MMWA claim. The claim is essentially that SEA was entitled to two opportunities to cure the defect, but that plaintiffs gave them only one.

First, SEA is incorrect that the MMWA requires two opportunities to cure a defect in class action cases. SEA's argument confuses two separate MMWA provisions. Specifically, SEA cites cases from outside the Third Circuit which conclude that plaintiffs must plead more than one attempt because the MMWA uses the plural "attempts" when requiring that consumers give warrantors a "reasonable number of attempts" to remedy a defect. *See, e.g., Temple v. Fleetwood Enters.*, 133 F. App'x 254, 268 (6th Cir. 2005). The phrase "reasonable number of attempts," however, comes from a statutory provision that is inapplicable here: 15 U.S.C. § 2304(a). The parties agree that § 2304 applies only to full warranties, not limited warranties like the one SEA offered the plaintiffs in this case. *See* Reply at 14, Opp. at 22.

The provision in the MMWA that actually applies in this case is 15 U.S.C. § 2310(e), which requires that the defendant be "afforded *a reasonable opportunity* to cure." *Id.* (emphasis added). If the use of the plural "attempts" in § 2304 implies multiple attempts, then by the same token the use of the singular "opportunity" must imply a single attempt under § 2310(e).[16] SEA's cases interpreting § 2304 are therefore unpersuasive.

Here, all of the plaintiffs claim that they contacted SEA to make a warranty claim and were rebuffed. (1AC ¶ 29, 37–38, 47, 55, 66, 72–74, 82.) That is sufficient to plead a reasonable opportunity to cure. *See Argabright*, 201 F. Supp. 3d at 601 n.11 (plaintiffs adequately pled reasonable opportunity where allegations demonstrate they sought a remedy for the defect from the defendant); *see also Livingston v. Trane*, 2019 WL 397982 at *13 (D.N.J. Jan. 31, 2019) (holding that named plaintiffs gave reasonable opportunity to cure by sending a demand letter). Plaintiffs have adequately pled that they have given SEA a reasonable opportunity to cure.[17]

The motion to dismiss the MMWA claims is therefore denied.

**C. Unjust Enrichment**

SEA opposes plaintiffs' state law unjust enrichment claims on two grounds: (1) that a written contract—here, the express warranty—governs the parties' relationship, precluding an unjust enrichment claim, and (2) that the

---

[16] Of course, the use of the phrase "reasonable" suggests that more than one attempt may be required in certain cases, just as I would likely find, if the issue were before me, that § 2304(a) does not *per se* require more than one attempt, as a reasonable number of attempts in a particular case could be only one. *See West Virginia University Hospital, Inc. v. Casey*, 499 U.S. 83, 115 (1991) (Stevens, J., dissenting) (courts "do the country a disservice when we needlessly ignore persuasive evidence of Congress' actual purpose" and opt instead to "put on [our]] thick grammarian's spectacles"). I am also cognizant of the perverse incentive of permitting the defendant to deny all claims once, in the hope that many claimants will not persist.

[17] Because plaintiffs have pled that they afforded SEA a reasonable opportunity to cure, I do not reach the question of whether 15 U.S.C. § 2310(e) excuses plaintiffs from this requirement in a class proceeding.

applicable state laws rule out unjust enrichment claims against a manufacturer if the plaintiff purchased the product from a third party. *See Green v. Green Mt. Coffee Roasters, Inc.*, 279 F.R.D. 275, 283 (D.N.J. 2011) (unjust enrichment requires "a direct relationship between the plaintiff purchaser and the defendant" because "[w]hen consumers purchase a product from a third party, they confer a benefit on that third party, not on the manufacturer").

### 1. Pleading unjust enrichment in the alternative

As for the first argument, it is generally true that the existence of a valid written agreement governing the rights of the parties rules out a parallel cause of action based on unjust enrichment. *Alhassid v. Nationstar Mortg., LLC*, 771 Fed. Appx. 965, 969 (11th Cir. 2019) (interpreting Florida law); *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 742 (7th Cir. 2017) (Illinois law); *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996) (California law); *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir. 1975) (Ohio law); *Walker v. Emergency Staffing Sols., Inc.*, 2017 WL 3206641 at *3 (D.N.M. Feb. 2, 2017) (New Mexico law); *Glauberzon v. Pella Corp.*, 2011 WL 1337509 at *11 (D.N.J. Apr. 5, 2011) (New Jersey law).

Plaintiffs, however, argue that the warranty is unconscionable, and thus does not apply. They correctly note that courts will permit unjust enrichment claims even when a contract governs the rights of the parties if the validity of the contract has been called into question. *See Grudkowski v. Foremost Ins. Co.*, 556 Fed. Appx. 165, 170 (3d Cir. 2014); *Melville v. Spark Energy, Inc.*, 2016 WL 6775635 at *5 (D.N.J. Nov. 15, 2016). SEA, in response, claims that unconscionability renders a contract "unenforceable or avoidable, not invalid," (Reply at 16), and that an unjust enrichment claim can stand only if the contract is invalid *per se*.

I disagree with SEA's proposed distinction, for these purposes, between "unenforceable" and "invalid." As regards pleading standards, that is a distinction without a difference. The key question is whether the contract

"governs the rights of the parties" *Glauberzon v. Pella Corp.*, 2011 WL 1337509 at *11 (D.N.J. Apr. 5, 2011), a question which does not turn on any arcane distinction between legal terms of art. We are at the pleading stage. If I ultimately determine that the warranty is unconscionable, then it will not govern the parties' rights. Plaintiffs are thus entitled to plead in the alternative that they are entitled to unjust enrichment.

The cases SEA cites for this proposition do not persuade. *Melville* involved allegations of unconscionable trade practices under the NJCFA, as opposed to contract-law unconscionability. 2016 WL 6775635 at *3. *In re Elk Cross Timbers Decking Mktg., Sales Practices & Prods. Liab. Litig.*, held that the allegations of unconscionability were insufficiently pled. 2015 WL 6467730 at *28 (D.N.J. Oct. 26, 2015). Neither case directly discussed SEA's proposed distinction, and as such neither offers any support for it.

The motion to dismiss the unjust enrichment claim on the basis of its being inconsistent with the warranty is therefore denied.

### 2. Unjust enrichment and third-party purchase

SEA's second argument requires an evaluation of each state's law regarding whether an unjust enrichment claim can be pled against a manufacturer where the plaintiff purchased the product via a third-party intermediary. Some do permit it; some permit it with conditions; and some do not permit it at all.

### a. California permits unjust enrichment claims against a manufacturer where the product was purchased from a third party

In California, unjust enrichment "is not narrowly and rigidly limited to quasi-contract principles," and the doctrine recognizes "there need be no relationship that gives substance to an implied intent basic to the 'contract' concept, rather the obligation is imposed because good conscience dictates that under the circumstances the person benefited should make reimbursement." *Professional Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 29 Cal. App. 5th 230, 240–41 (Cal. App. 2018); *see also Kossian v. American Nat. Ins. Co.*, 254 Cal.

App. 2d 647, 649–51 (Cal. App. 1967) (rejecting argument that unjust enrichment could not be brought due to lack of privity). Thus, "California law imposes no requirement of privity to make out an unjust enrichment claim." *In re GM LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 882 (N.D. Cal. 2019).

SEA claims that under *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1662–63 (Cal. App. 1992), California law requires that the "plaintiff conferred a benefit on the defendant." Mot. to Dismiss at 29. That misconstrues *Perry*, which held instead that "[a]n individual is required to make restitution if he or she is unjustly enriched at the expense of another" and "it is unjust for the person to retain it." *Id.* There is no requirement that the benefit flow directly from the plaintiff to the defendant, but rather only that a defendant have benefited unjustly at a plaintiff's expense.

The motion to dismiss the California unjust enrichment claim is therefore denied.

### b. Florida unjust enrichment claim dismissed for failure to allege direct benefit

To make out a claim for unjust enrichment under Florida law, a plaintiff must establish a direct relationship between the plaintiff and the defendant. "[T]o prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017). Though *Kopel* did not explain what it means to "directly confer a benefit," it concluded that the plaintiff had no claim for unjust enrichment against a debtor based on an unrepaid loan of over $7 million dollars because the loan had actually been made to the debtor's corporation rather than to the debtor individually. 229 So. 3d at 817–18. *Kopel* cited *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank* in support of a "direct benefit" requirement, and in that case an intermediary, Southeast, entered into separate participation agreements with five other banks, one of which was Peoples, and another of which was First Union. 667 So. 2d 786, 877 (Fla. Dist. Ct. App. 1996).

Southeast then defaulted on the loan and went bankrupt. *Id.* Peoples brought an unjust enrichment claim against First Union, claiming that it had received an unfair share of payments from Southeast, to Peoples' detriment. *Id.* at 878. The court rejected Peoples' argument, concluding that it had not "directly conferred a benefit on the defendants," but rather "if any benefit was conferred . . . in the form of overpayments, it could only have been conferred upon them by Southeast, not Peoples National." *Id.* at 879.

Based on *Kopel* and *Peoples*, I am convinced that the presence of an intermediary rules out an unjust enrichment claim under Florida law. Plaintiffs rely on *Carriuolo v. Gen. Motors LLC*, which concluded that a benefit does not cease being "direct" merely because it passes through an intermediary such as a car dealership, 72 F. Supp. 3d 1323, 1326–27 (S.D. Fla. 2014), but that case arose before *Kopel*, and in any event, I am bound to follow the holdings of Florida's highest court, not federal decisions from district courts located outside the Third Circuit. *Brown & Root Braun*, 54 Fed. Appx. at 547. To properly plead an unjust enrichment claim under Florida law, plaintiffs must re-allege their claim with a plaintiff who purchased his or her dryer directly from SEA.

The motion to dismiss the Florida unjust enrichment claim is granted.

### c. Illinois unjust enrichment claim dismissed for failure to allege required circumstances

Plaintiffs have also failed to state an unjust enrichment claim under Illinois law. Under Illinois law, "to state a claim of unjust enrichment, 'a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2010 WL 2813788 at *24 (D.N.J. July 9, 2010) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E. 2d 672, 679 (Ill. 1989)). Where a plaintiff did not give money directly to a defendant, but gave the money to a third-party, who then transferred that money to the defendant, "retention of the benefit would be unjust if '(1) the

benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant.'" *Id.* (quoting *HPI*, 545 N.E.2d at 679).

In *Ford Motor Co. E-350 Van Prods.*, the plaintiff had purchased two E-350 vans from a Ford dealership, but could not provide any evidence suggesting the money paid to the dealership made its way to Ford. *Id.* It also could not demonstrate that any of the three bases for indirect unjust enrichment applied. The court noted there was no evidence that the plaintiff accidentally paid the dealership rather than Ford, or that the plaintiff had a better claim to the money spent on the vans than Ford. *Id.* As for the last reason which justifies indirect unjust enrichment, the court explained that "[i]t is not enough to show that the defendant, at some point in time, behaved 'wrongfully'; rather, the plaintiff must show that the defendant 'procured the benefit . . . through some type of wrongful conduct." *Id.* (quoting *Independent Trust Corp. v. Fidelity Nat'l Title Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1051 (N.D. Ill. 2008)). The court also rejected the plaintiff's attempt to distinguish *HPI* and *Independent Trust Corp.* by arguing that its transfer of money to the dealership also benefitted Ford, reasoning that *HPI*'s three indirect requirements apply whenever "someone other than the plaintiff transfers the benefit to the defendant." *Id.* at 25.

Plaintiffs cite *Cleary v. Philip Morris, Inc.* for the proposition that manufacturers can be subject to unjust enrichment claims. 656 F.3d 511, 519 (7th Cir. 2011). *Cleary* did involve a suit against a cigarette maker, and it is likely that the plaintiffs in that case purchased their cigarettes from third parties. *Cleary*, however, only serves as persuasive authority, and the court never actually discussed the indirect unjust enrichment aspect of the case.

Plaintiffs have not pled facts supporting any of the three *HPI* scenarios, or indeed any facts indicating that the third-party retailers they purchased

their dryers from transferred any money to SEA at all, much less that those retailers transferred money to SEA mistakenly. There are no allegations that SEA engaged in any wrongful conduct that misled the third-party retailers into transferring them a share of plaintiffs' purchase, and there is no indication that plaintiffs have a better claim than SEA to any money actually transferred. Because plaintiffs do not plead facts supporting any of the three indirect-unjust-enrichment causes of action, they have failed to state a claim for unjust enrichment under Illinois law.

The motion to dismiss the Illinois unjust enrichment claim is granted.

### d. New Jersey permits unjust enrichment claims against a manufacturer where the product was purchased from a third party

New Jersey law permits suits against manufacturers even when the plaintiff purchased his or her dryer from a third-party intermediary. New Jersey's Supreme Court has not decided this issue, while some New Jersey federal courts have concluded that a "a direct relationship between the plaintiff purchaser and the defendant" is required and that no such direct relationship exists between a consumer and a manufacturer when a retailer stands between them. *Green v. Green Mt. Coffee Roasters, Inc.*, 279 F.R.D. 275, 283 (D.N.J. 2011); *see also Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 724 (D.N.J. 2011). Since the issue has not yet been decided, I am obligated to examine the relevant principles of law and New Jersey Appellate Division opinions to determine what the New Jersey Supreme Court would do in this situation. *Brown & Root Braun*, 54 Fed. Appx. at 547.

My evaluation of New Jersey state court decisions suggests that they do indeed require a "direct relationship" between the plaintiff and defendant, but this is a term of art. The "direct relationship" required does not rule out finding a manufacturer liable despite the presence of a third-party intermediary. *See Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 109 (App. Div. 1966) (requiring a "direct relationship" between the parties). What constitutes a sufficiently "direct relationship" to permit a finding of unjust enrichment will

41

depend heavily on the facts of the individual case, *Stewart v. Beam Global Spirits & Wine*, 877 F. Supp. 2d 192, 197 (D.N.J. 2012), but the key evaluative criterion is whether the relationship "would create a reasonable expectation of benefit" between the parties. *Castro v. NYT Television*, 370 N.J. Super. 282, 300 (App. Div. 2004). Such a reasonable expectation is present here, so I find that plaintiffs have stated a claim for unjust enrichment.

The New Jersey Appellate Division considered the "direct relationship" requirement in *Callano v. Oakwood Park Homes Corp.*, where an individual named Pendergast entered into two agreements: first, he agreed to purchase a house from the defendant developer, and second, he bought a shrubbery from the plaintiff, which the plaintiff then delivered and planted at Pendergast's house. 91 N.J. Super. 105, 107 (App. Div. 1966). Pendergast then died without ever paying for the shrubbery or completing his purchase of the house. *Id.* The plaintiff sued the developer for unjust enrichment on the theory that he had improved the property with a shrubbery and not received any compensation. *Id.* at 107–08.

The Appellate Division concluded it "would be inequitable to hold defendant liable," reasoning that the plaintiffs and defendants had no dealings with one another and the plaintiff had never expected any benefit from the defendant in return for delivering the shrubbery. *Id.* at 109. Thus, though the court noted the absence of a direct relationship between the parties, *id.*, its decision was rooted primarily in the fact that it would be inequitable to hold responsible an innocent third party completely unrelated from the agreement between plaintiff and Pendergast and from whom plaintiff never expected to receive any benefit. *Id.*

Similarly, in *VRG Corp. v. GKN Realty Corp.*, the plaintiff, a real estate broker, entered into an agreement with a corporation to find tenants for the corporation's shopping center. 135 N.J. 539 (N.J. 1994). The corporation then sold the shopping center to GKN, and stopped paying the plaintiff. *Id.* at 545. The plaintiff sued GKN for unjust enrichment, demanding its fee. *Id.* The New

Jersey Supreme Court concluded there was no basis for unjust enrichment because it was the corporation, not GKN, that was unjustly enriched, and concluded that GKN had derived no benefit from the corporation's broken promise. *Id.* at 554–55.

Since those decisions, the Appellate Division decided *Shazo v. Martino*, 2019 WL 3315643 (App. Div. July 24, 2019). There, the defendant's property was foreclosed upon, but defendant nevertheless remained in the property and continued to incur property taxes and sewer and water bills. *Id.* at 1. The plaintiff won the property in a sheriff's sale, and upon discovering the tax and utility bills, sued the plaintiff for unjust enrichment on the theory that the defendant had unfairly received the benefit of the property without paying for it. *Id.* The court rejected the defendant's argument that no direct relationship existed between her and the plaintiff, reasoning that the plaintiff "either knew or should have known that she would be responsible for [tax and utility] payments and that in order to avoid liens, either her former foreclosing mortgagee or plaintiff, a purchaser as a sheriff's sale, would be responsible . . . . [thus], a relationship existed between the parties warranting plaintiff's recovery under unjust enrichment." *Id.* at 3.

Taking *Shazo*, *VRG*, and *Callano* together, the "direct relationship" inquiry appears essentially to be no more than a requirement that it be fair that the defendant be required to return a benefit derived from the plaintiff. While, as noted, no New Jersey state court has come to that conclusion explicitly, several federal courts in New Jersey agree. *See Capital Health Sys. v. Veznedaroglu*, 2017 WL 751855 at *11 (D.N.J. Feb. 27, 2018) ("New Jersey's 'direct relationship' requirement [i]s unnecessary where it can be determined that the defendant is not merely an innocent third party"); *see also Stewart v. Beam Glob. Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 197–200 (D.N.J. 2012) (same). Certainly, in light of *Shazo*, it is clearly not the case that New Jersey law prohibits unjust enrichment simply because the parties are not in privity,

or where there is an intermediary like the foreclosing bank or sheriff's office in *Shazo*.

Furthermore, even those New Jersey federal courts which have ruled out unjust enrichment against a manufacturer have recognized that such claims are permissible where the plaintiff also alleges that the manufacturer "engaged in fraudulent conduct." *Suriaga v. GE*, 2019 WL 6799613 at *7 (D.N.J. Dec. 12, 2019). The court in *Callano* recognized this possibility as well, concluding that unjust enrichment is justified where there has been "fraud perpetrated by defendants." 91 N.J. Super. at 110 (citing *De Gasperi v. Valicenti*, 198 Pa. Super. 455 (Pa. Super Ct. 1962)). While *Callano* did not explain what fraud would justify an unjust enrichment claim, federal courts applying its holding have concluded that if a manufacturer is alleged to have engaged in a false marketing campaign or to have failed to disclosed a defect, plaintiffs have made out a claim for unjust enrichment. *See Morcom v. LG Elecs., USA, Inc.*, 2017 WL 8784836 at *10 (D.N.J. Nov. 30, 2017; *Stewart*, 877 F. Supp. 2d at 200. Plaintiffs have made such allegations and as such have stated a claim.

The motion to dismiss the New Jersey unjust enrichment claim is denied.

### e. New Mexico permits unjust enrichment claims against a manufacturer where the product was purchased from a third party

Plaintiffs have also pled a claim under New Mexico law. New Mexico recognizes an unjust enrichment claim even where the parties are not in privity. *Ontiveros Insulation Co. v. Sanchez*, 129 N.M. 200, 203–04 (N.M. Ct. App. 2000) (permitting suit by subcontractor against homeowner with whom subcontract did not have a contract); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 4501223 at *13 (N.D. Cal. Sep. 28, 2011) (noting that there were no cases supporting proposition that New Mexico law requires a direct relationship).

The motion to dismiss the New Mexico unjust enrichment claim is denied.

44

### f. Ohio unjust enrichment claim dismissed for failure to allege economic transaction between manufacturer and plaintiff

Plaintiffs have not stated an unjust enrichment claim under Ohio law. Ohio requires an "economic transaction" between the parties to ground an unjust enrichment claim, because the plaintiff must establish "that a benefit had been conferred upon that defendant by the purchaser." *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005); *Paulus v. Beck Energy Corp.*, 94 N.E.3d 73, 98 (Ohio Ct. App. 2017) (applying *Johnson*). In *Johnson*, because the plaintiff had purchased her computer from a retailer rather than directly from Microsoft, she could not bring an unjust enrichment claim. 834 N.E.2d at 793, 799. Thus, plaintiffs fail to state a claim under Ohio law.

The motion to dismiss the Ohio unjust enrichment claim is granted.

## IV.    CONCLUSION

For the reasons set forth above, the motion to dismiss is GRANTED in part and DENIED in part. Because it appears that amendment would not necessarily be futile, these dismissals are entered without prejudice, except as to plaintiffs' ODTPA claim, which is dismissed with prejudice.

An appropriate order follows.

Dated: October 26, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

45